UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. Case No. 8:26-cr-43-VMC-SPF

ANTONIO QUINN MARTIN

______________________________/

**ORDER**

This matter comes before the Court pursuant to Defendant Antonio Quinn Martin's Motion to Suppress Evidence Seized Pursuant to Search Warrants and Request for Evidentiary and Franks Hearing (Doc. # 43), filed on August 12, 2026. The United States of America responded on August 31, 2026. (Doc. # 51). For the reasons that follow, the Motion is denied.

## I. Background

Mr. Martin has been indicted on four counts: (1) conspiracy to distribute a controlled substance (Count One); (2) possession with intent to distribute fentanyl (Count Two); (3) possessing a firearm in furtherance of a drug trafficking crime (Count Three); and (4) possession of a firearm or ammunition by a convicted felon (Count Four). (Doc. # 13).

As part of the investigation into Mr. Martin, the DEA obtained on January 14, 2026, federal search warrants for two

locations: (1) a residence in Sarasota (Target Location 1) and (2) a storage unit in Sarasota (Target Location 2). A DEA agent, Ryan Brothers, executed an affidavit in support of the search warrants. (Doc. # 44-1; Doc. # 44-2; Doc. # 51-1). United States Magistrate Judge Lindsay S. Griffin signed the warrants. (Doc. # 44-1; Doc. # 44-2).

Agent Brothers' 29-page affidavit conveyed the following information in relevant part.

**A. Beginning of Investigation**

In June 2025, agents began investigating Mr. Martin for suspected narcotics trafficking. (Doc. # 51-1 at ¶¶ 6-8). A cooperator identified Mr. Martin through his Facebook account and reported purchasing approximately one ounce of fentanyl from him at a time. According to the cooperator, the drug sales occurred near "the dead-end of Chilk Avenue in Sarasota, Florida." (Id.). In December 2025, a second cooperator (referred to as CD1) identified Mr. Martin from a photograph as a man from whom he had purchased seven to fourteen grams of fentanyl at a time at the dead-end street on Chilk Avenue. (Id. at ¶ 10). CD1 also provided a telephone number used by Mr. Martin. (Id.).

On December 1, 2025, officers with the Sarasota County Sheriff's Office "observed a Chevrolet Tahoe bearing [a New

York tag] depart from the vicinity of Chilk Avenue, Sarasota, Florida and travel to" the residence referred to as Target Location 1. (Id. at ¶ 12). The next day, a confidential source (CS1) provided law enforcement with the same telephone number previously attributed to Mr. Martin and identified Mr. Martin from a photograph as someone who "distributed narcotics from the area of Chilk Avenue in Sarasota." (Id. at ¶ 14).

**B. Controlled Buys**

On December 3, 2025, CS1 placed a controlled call to Mr. Martin and arranged to purchase an ounce of methamphetamine. (Id. at ¶¶ 15-16). CS1 then met Mr. Martin near the dead end of Chilk Avenue. Agents observed CS1 enter the same Chevrolet with a New York plate that they had previously seen travel from Chilk Avenue to the residence called Target Location 1. Afterwards, CS1 provided agents with a bag containing suspected fentanyl and a bag containing suspected methamphetamine and identified Mr. Martin as the person who supplied the drugs. (Id. at ¶¶ 15-21).

Another controlled purchase of methamphetamine by CS1 occurred on December 23, 2025, which CS1 and Mr. Martin arranged via text message. (Id. at ¶¶ 22-30). Agents established surveillance at Target Location 1. After Mr. Martin confirmed to CS1 that he was ready for the deal, Mr.

Martin and a woman exited Target Location 1 and departed in a Toyota that had been parked in the driveway. Law enforcement maintained surveillance as the Toyota traveled to the meeting location and observed CS1 speak to the passengers of the Toyota through the window. Mr. Martin was driving the Toyota. Following the sale, CS1 provided agents with about four ounces of suspected methamphetamine obtained from Mr. Martin. (Id.).

In early January 2026, CS1 arranged another drug purchase with Mr. Martin for methamphetamine and fentanyl. (Id. at ¶¶ 31-40). The affidavit variously dates this controlled purchase as January 5 or January 6, 2026; nevertheless, the parties treat the affidavit as describing a single controlled purchase on one of those days. Law enforcement established surveillance at Target Location 1 before the controlled purchase. They observed Mr. Martin exit Target Location 1 and get into the Toyota. The Toyota then traveled to a store, which Mr. Martin briefly entered.

Mr. Martin reentered the Toyota and drove to the storage unit called Target Location 2. Mr. Martin entered a storage unit and eleven minutes later exited the storage unit and "appear[ed] to place an item in the driver's side door" of the Toyota. (Id. at ¶¶ 34-36). He then drove directly to the prearranged meeting spot near the dead end of Chilk Avenue,

arriving about ten minutes after leaving the storage unit. (Id. at ¶ 37). There, CS1 purchased suspected fentanyl and methamphetamine from Mr. Martin. CS1 observed that Mr. Martin "had additional narcotics and packaging on the floor board of the driver's side." (Id. at ¶ 39).

### C. **Storage Unit**

Agents contacted the management of Target Location 2 and learned that a woman ("A.H.") rented the unit in question. Notably, A.H.'s listed address was the same address appearing on Mr. Martin's driver's license. Management also informed agents that each renter received an assigned access code for entering and exiting the storage facility. (Id. at ¶¶ 42-43).

An agent reviewed the facility's surveillance video and confirmed that Mr. Martin entered Target Location 2 just before the January controlled purchase. The video also appeared to show Mr. Martin placing an item inside the Toyota's driver's side door after exiting the storage unit and before traveling to meet CS1. (Id. at ¶ 44). This matches the observations of the agents who surveilled the January controlled purchase.

Agents obtained access code logs for the storage facility for the code assigned to A.H. From December 7, 2025, to December 29, 2025, "the access code was used over thirty

times to enter and exit the gates of" Target Location 2. (Id. at ¶ 45). "Most notably, on December 16, 2025, agents conducted a controlled purchase from [Mr. Martin]. CS1 coordinated the controlled purchase with [Mr. Martin] on December 15 and December 16, 2025. On December 16, 2025, at approximately 11:18 A.M., [A.H.'s] access code was used to enter Target Location 2. At approximately 12:30 P.M., CS1 conducted the controlled purchase from [Mr. Martin] for methamphetamine." (Id. at ¶ 46).

On January 8, 2026, a trained K-9 conducted an open-air sniff of five storage units, including the unit belonging to A.H. (Target Location 2). Although the agent noted the K-9's interest in that storage unit, the K-9 did not give a positive final alert. (Id. at ¶ 42 n.6).

Based on this evidence and his training and experience, Agent Brothers averred that he "believe[s] [Mr. Martin] uses Target Location 2 to store methamphetamine, fentanyl, and evidence of his drug trafficking activities." (Id. at ¶ 47). He wrote:

> I believe it's common for drug traffickers to use a stash location in addition to their actual residence. I believe [A.H.'s] access code is utilized by [Mr. Martin] and his co-conspirators to retrieve narcotics from Target Location 2. **I believe [Mr. Martin's] almost daily access to Target Location 2, to include on December 16, 2025,**

> **and January 5, 2026, is indicative of narcotics storage.** I believe the access code is not always used to enter or exit Target Location 2 if [Mr. Martin] follows a vehicle in or out, like he did on January 5, 2026.

(Id.) (emphasis added). The bolded sentence in the previous paragraph is the focus of Mr. Martin's request for a hearing under Franks v. Delaware, 438 U.S. 154 (1978).

**D. Search Warrants and Motion**

As mentioned above, Judge Griffin signed search warrants for Target Location 1 and Target Location 2 on January 14, 2026. (Doc. # 44-1; Doc. # 44-2). According to the United States, the "warrants issued by Judge Griffin were based solely on the affidavit" of Agent Brothers. (Doc. # 51 at 3). The searches resulted in the seizure of narcotics, firearms, currency, a scale, and other evidence. (Id. at 2). The charges against Mr. Martin followed.

Mr. Martin now moves to suppress the evidence obtained from Target Location 1 and Target Location 2. (Doc. # 43). He contends that the affidavit did not establish a sufficient nexus between his alleged narcotics trafficking and either location. He also challenges Agent Brothers' characterization of the storage facility access records and requests a Franks hearing. The United States has responded. (Doc. # 51).

Because the Court can assess the sufficiency of the warrants by reviewing the affidavit alone, the Court and the parties agree that no evidentiary hearing is required on the suppression request. (Id. at 12; Doc. # 53); see United States v. Spearman, 178 F.4th 1295, 1307 (11th Cir. 2026) ("Upon receiving such a motion to suppress, a district court may elect to hold a hearing. But it need not do so in all circumstances. Instead, for a hearing to be required, the motion must allege facts which, if proven, would provide a basis for relief." (citation and internal quotation marks omitted)). Although Mr. Martin continues to request an evidentiary hearing regarding the need for a Franks hearing, the Court was able to make that determination purely by reference to the affidavit. The Motion is now ripe for review.

## II. Legal Standard

### A. Fourth Amendment and Warrant Requirements

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Accordingly, warrants to effectuate a search or seizure must be based upon probable cause and supported by oath or affirmation, "particularly describing the place to be searched, and the persons or things to be seized." Id. "The Fourth Amendment requires that 'those searches deemed

necessary should be as limited as possible.'" United States v. Blake, 868 F.3d 960, 973 (11th Cir. 2017) (citation omitted).

"Probable cause to support a search warrant exists when, under the totality of the circumstances, there is a fair probability of finding contraband or evidence at a particular location." United States v. Woodard, 662 F. App'x 854, 858 (11th Cir. 2016). An affidavit in support of a search warrant "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). "The connections and links can come from an officer's own observations, witnesses, or other facts." United States v. Holmes, 141 F.4th 1183, 1195 (11th Cir. 2025). "Of course, the mere fact that a particular suspect has possessed contraband in the past does not suffice. There must be a probability of criminal activity at the residence in question." Id. "But where an officer links a residence to a defendant found in possession of contraband and explains why contraband is likely to be found in that location, issuance of a warrant is appropriate." Id.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." Id. at 238-39 (citation and internal quotation marks omitted).

**B. Franks Hearing**

In Franks, the Supreme Court held "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155-56. "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided

and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id. at 156.

"In order to be entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit, a defendant must make a substantial preliminary showing that the affiant made false statements, either intentionally or with reckless disregard for the truth, pointing specifically to the portions of the affidavit claimed to be false, and that the false statements were necessary to the finding of probable cause." United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009). "When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading." Id. (citation omitted). "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. (citation omitted). "Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause." Id.

"The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'" Id. (quoting United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)). "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Id. (citation and internal quotation marks omitted).

**C. Exclusionary Rule and Good-Faith Exception**

When the government effectuates an unlawful search, the exclusionary rule provides a remedy by prohibiting the introduction of tangible materials seized. "Because good-faith mistakes cannot be deterred, the exclusionary rule applies only if 'the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" United States v. McCall, 84 F.4th 1317, 1323 (11th Cir. 2023) (citation omitted); see also United States v. Leon, 468 U.S. 897, 922 (1984). "In 'doubtful or marginal cases,' suppression is inappropriate." McCall, 84 F.4th at 1323 (citation omitted). "Consistent with the rule's objective of future deterrence, the Supreme Court carved out a 'good faith exception' to the exclusionary rule." Id. "[W]hen law

enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." Id. (citation omitted).

"This 'exception' has special relevance when officers act pursuant to a warrant." Id. "'In the ordinary case, an officer cannot be expected to question' a judge's decision that the requirements for a warrant have been satisfied or that the form of the warrant is sufficient." Id. (citation omitted). "Therefore, suppressing evidence discovered pursuant to a warrant generally cannot logically contribute to . . . deterrence." Id. (citation and internal quotation marks omitted).

"The Leon good faith exception applies in all but four limited sets of circumstances." United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002). "The four sets of circumstances are as follows: (1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his judicial role []'; (3) where the affidavit supporting the

warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid.'" Id. (citations omitted).

In short, the "good faith exception requires suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. (citation omitted).

## III. Analysis

### A. Sufficiency of the Warrants

Mr. Martin asserts there was not probable cause to search Target Location 1 and Target Location 2 because there was an insufficient nexus between these locations and Mr. Martin's alleged drug trafficking. (Doc. # 43 at 6-16).

Not so. The Court "look[s] only to the face of the affidavit to determine whether it lacked sufficient indicia of probable cause." McCall, 84 F.4th at 1325. Here, the warrant affidavit established probable cause to search both

Target Location 1 and Target Location 2. The affidavit provided probable cause to believe that Mr. Martin is a drug dealer and that the residence and storage unit were used as part of his drug trafficking activity.

Most importantly, Mr. Martin was surveilled by law enforcement traveling from Target Location 1 and Target Location 2 directly to drug deals with CS1. Specifically, on December 23, 2025, CS1 arranged via telephone a drug deal with Mr. Martin. After Mr. Martin informed CS1 that he was ready to meet, Mr. Martin left the residence called Target Location 1, got in a car, and drove directly to the prearranged meeting location where Mr. Martin allegedly sold drugs to CS1. (Doc. # 51-1 at ¶¶ 22-30).

Similarly, in early January, CS1 and Mr. Martin arranged another drug deal. Mr. Martin left Target Location 1 and traveled to the storage unit at Target Location 2. Agents observed Mr. Martin leave the storage unit and "appear to place an item in the driver's side door" of his vehicle. (Id. at ¶¶ 31-36). He then drove directly to the prearranged meeting spot and completed the drug deal with CS1 about ten minutes after leaving the storage unit. (Id. at ¶¶ 36-37). After the drug purchase, CS1 observed that Mr. Martin "had

additional narcotics and packaging on the floor board of the driver's side." (Id. at ¶ 39).

Although the records of access code use for the storage unit do not identify the person who used the code, the affidavit notes that the access code was also used shortly before yet another controlled purchase of drugs. "[O]n December 16, 2025, agents conducted a controlled purchase from [Mr. Martin]. CS1 coordinated the controlled purchase with [Mr. Martin] on December 15 and December 16, 2025. On December 16, 2025, at approximately 11:18 A.M., [A.H.'s] access code was used to enter Target Location 2. At approximately 12:30 P.M., CS1 conducted the controlled purchase from [Mr. Martin] for methamphetamine." (Id. at ¶ 46).

Thus, Mr. Martin's presence was observed by law enforcement at both Target Location 1 and Target Location 2 shortly before controlled purchases of drugs from Mr. Martin were completed. Similarly, there is additional evidence that someone, very possibly Mr. Martin, entered Target Location 2 shortly before another controlled purchase. Although the storage unit was not registered in Mr. Martin's name, the woman who rented the storage unit, A.H., provided an address for herself that matched the address on Mr. Martin's driver's

license. (Id. at ¶ 43). Additionally, the fact that the K-9 did not positively alert for drugs at the storage unit does not undermine the other evidence that the storage unit was used as part of Mr. Martin's alleged drug dealing.

The evidence of Mr. Martin's presence at the two locations shortly before the controlled purchases of drugs distinguishes this case from United States v. Lockett, 674 F.2d 843 (11th Cir. 1982). In Lockett, the affidavit established that the defendant had purchased dynamite and might have used it in a bomb approximately sixty miles from his residence. But the affidavit supplied no factual observation connecting the dynamite to the residence to be searched. See Id. at 847 ("The affidavit here discloses no facts from which the magistrate could reasonably infer that dynamite was located on the Marengo County property. The fact that Lockett may have placed a bomb next to a building some 60 miles from Sweetwater is not enough."). In contrast, the affidavit here "establish[ed] a connection between [Mr. Martin] and the [locations] to be searched and a link between the [locations] and any criminal activity." Martin, 297 F.3d at 1314.

"[U]nder the totality of the circumstances, there [was] a fair probability of finding contraband or evidence at"

Target Location 1 and Target Location 2. Woodard, 662 F. App'x at 858. Probable cause existed and the Motion to suppress is therefore denied. See Holmes, 141 F.4th at 1195 (affirming denial of suppression because the affidavit established a sufficient nexus between the residence and the criminal activity where the arson victim linked defendant to the arson and identified where he lived, the car in which defendant had been spotted driving away from the arson was parked in front of the residence, defendant exited the residence when he entered that car while being observed by law enforcement, and defendant's years-long drug dealing supported the inference that additional evidence would be found inside).

**B. Request for Franks Hearing**

Again, a Franks hearing "is required when 'the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'" United States v. Valencia-Trujillo, 573 F.3d 1171, 1182 (11th Cir. 2009) (citation omitted).

Mr. Martin has failed to make the necessary substantial preliminary showing to warrant a Franks hearing. The only

alleged false statement in the affidavit he identifies was the statement that Mr. Martin had "almost daily access to Target Location 2." (Doc. # 43 at 16-17). True, the access code records for the storage unit could not definitively attribute the code uses to Mr. Martin, rather than A.H. or another individual. But, while the characterization of the access records may not have been ideal, the statement was not false. The affidavit does not represent that the storage facility's access records themselves identified Mr. Martin as the person who entered A.H.'s code. The neutral information underlying the characterization (that the access records proved that someone used A.H.'s code to enter and exit the gates of Target Location 2 "over thirty times" from "December 7, 2025, to December 29, 2025") was also presented to the Magistrate Judge. (Doc. # 51-1 at ¶ 45). Furthermore, Agent Brothers made it clear that it was his belief, rather than a fact, that Mr. Martin had almost daily access to the storage unit. See (Id. at ¶ 47) ("I believe [Mr. Martin's] almost daily access to Target Location 2, to include on December 16, 2025, and January 5, 2026, is indicative of narcotics storage."). Considered in context, the statement was not false but merely the agent's interpretation of the access code records.

Regardless, even if the Court assumes that Mr. Martin has made a substantial preliminary showing as to falsity, the statement at issue was not material. "When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading." Kapordelis, 569 F.3d at 1309 (citation omitted). Even without the statement about "[Mr.] Martin's almost daily access," there was probable cause to issue the search warrant for Target Location 2. Again, the objective information about the numerous uses of the access code that underlies the "almost daily access" characterization was included in the affidavit. Likewise, the close timing between Mr. Martin's visit to the storage unit and a controlled drug purchase was included in the affidavit: Mr. Martin went to the storage unit, he was observed putting something into his car after exiting the storage unit, and he then immediately traveled to the prearranged meeting at which he sold drugs to CS1. (Doc. # 51-1 at ¶¶ 34-39).

Because the affidavit established probable cause to search Target Location 2 even without the challenged statement, a Franks hearing is not warranted. See Kapordelis, 569 F.3d at 1309 ("[I]f, when material that is the subject of

the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." (citation and internal quotation marks omitted)).

**C. Good-Faith Exception**

Alternatively, even if there were not probable cause for the issuance of the search warrants, the good-faith exception would apply. The good-faith exception applies except under four circumstances: "(1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his judicial role []'; (3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid.'" Martin, 297 F.3d at 1313 (citations omitted).

None of those circumstances is present. The Court has already found, in denying the request for a Franks hearing, that the Magistrate Judge was not misled by false statements in the warrant affidavit. The Magistrate Judge did not wholly abandon her judicial role. The warrants also identified the places to be searched and the items to be seized. Thus, the warrants were not facially deficient.

Finally, the warrant affidavit was not barebones. It provided significant information about Mr. Martin's alleged drug trafficking activities and connections with Target Location 1 and Target Location 2. The affidavit included sufficient indicia of probable cause such that it was reasonable for agents to believe that probable cause existed. This is not a situation in which the affidavit provided "'no hint' as to why police believed they would find incriminating evidence" at the target locations. McCall, 84 F.4th at 1325 (citation omitted).

Because none of these circumstances is present, the good-faith exception applies. The Court would not suppress the evidence seized pursuant to the search warrants even if the warrant affidavit failed to establish probable cause.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Antonio Quinn Martin's Motion to Suppress Evidence Seized Pursuant to Search Warrants and Request for Evidentiary and Franks Hearing (Doc. # 43) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 15th day of September, 2026.

Virginia M. Hernandez Covington
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE